NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BELLEVILLE EDUCATION ASSOCIATION, *On Behalf of Michael F. Mignone*,<br><br>Plaintiff,<br><br>v.<br><br>THE BOARD OF EDUCATION OF BELLEVILLE, ESSEX COUNTY<br><br>Defendant. | Civil Action No.: 17-1892 (JLL)<br><br>**OPINION** |

**LINARES**, District Judge.

This matter comes before the Court by way of a motion to dismiss this action, which motion was filed by Defendant Board of Education of Belleville, Essex County. (ECF No. 2). Plaintiff Belleville Education Association, acting on the behalf of Michael F. Mignone, has opposed Defendant's motion (ECF No. 5), and Defendant has replied to same (ECF No. 6). This Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated herein, the Court grants Defendant's motion to dismiss this matter.

## I.    Background

Plaintiff Belleville Education Association ("Plaintiff" or the "Association") brings this action on behalf of one of its members, Michael F. Mignone ("Mignone"). (ECF No. 1-1, Complaint, "Compl." at 1). Mignone is the duly-elected President of the Association, and is also a teacher employed by Defendant Board of Education of Belleville (the "Board" or "Defendant"). (Id. ¶ 2). In short, the Association seeks a declaratory judgment to the effect that one of the Board's

written Policies, Policy 3233, is unconstitutional on its face and also as applied to Mignone. (Id. at 3).

On November 3, 2015, Mignone was distributing campaign material at Belleville High School in support of a candidate for the Board of Education. (Id. ¶ 4). On this day, the School was closed. (Id.). Plaintiff alleges that Mignone did not distribute literature to students or children; rather, he only distributed the campaign material to "those eligible to vote." A few days later, Mignone received a letter dated November 9, 2015 from the Superintendent of Schools, Dr. Richard D. Tomko. (Id. ¶ 5). In said letter, Dr. Tomko states that, despite being advised of two Board Policies which, according to Dr. Tomko, prohibited Mignone from distributing campaign materials on Election Day, Mignone was "repeatedly witnessed engaging in partisan electioneering activities on District Property, specifically in front of Belleville High School." (Id.; Compl., Exh. C). The letter continues as follows:

> Your blatant disregard for both my directive and Belleville Board Policy clearly constitutes insubordination and conduct unbecoming of an employee of the district. This type of behavior cannot and will not be tolerated, and must immediately cease. This action is particularly disappointing in that you have recently been reprimanded for other similar conduct. I ask you once again to refrain from such behavior in the future or you will subject yourself to further discipline.

(Compl., Exh. C). The letter references two Board Policies in particular. Policy 3233 is entitled "Political Activities," and outlines four guidelines concerning political participation. In pertinent part, the first guideline provides that "[a] teaching staff member shall not engage in public activity on school premises unless permitted in accordance with Board Policy No. 7510—Use of School Facilities and/or applicable Federal or State laws." (Id. ¶ 3). Policy 7510, in turn, prohibits the "use of school facilities for the advantage of any commercial or profit-making organization, partisan political activity, or any private social functions." (Compl.; Exh. B).

The Association alleges that "[b]efore the election in 2016, Dr. Tomko sent Mignone (and it is assumed all other staff—at least the Presidents of the other unions) at least three mailings/emails reminding them to abide by [Policies] 3233 and 7510." (Compl. ¶ 7). Fearing further disciplinary action, Mignone did not distribute campaign literature during the 2016 election. (Id.).

Defendant and the Association are parties to a Collective Bargaining Agreement ("CBA") effective July 1, 2015 through June 30, 2018. (ECF No. 5, "Def.'s Mov. Br., Exh. F, "CBA"). In pertinent part, the CBA provides that the Association or a member of the Association may file a "grievance," which is defined as a "claim . . . based upon[, *inter alia*,] the interpretation, application or alleged violation of . . . District policies . . . ." (CBA at 9). Pursuant to the CBA, the Association initiated a grievance against the Board on behalf of Mignone and pursued that grievance through all three levels of the grievance procedure. (See id. at 10; Def.'s Mov. Br., Exh. G). When the Board denied Plaintiff's level three grievance, the Association filed a request for arbitration with the Public Employment Relations Commission ("PERC"), pursuant to the terms of the CBA. (Def.'s Mov. Br., Exh. H). The Association defined the grievance to be arbitrated as follows: "The Belleville Board of Education and/or Administration violated contract language, administrative code and any other relevant article, statute or board policy when they disciplined Mr. Michael Mignone over an electioneering concern." (Id.). However, before the scheduled November 30, 2016 hearing date, the Association cancelled the hearing and has not sought to reschedule same.

Against this backdrop, Plaintiff filed a lawsuit in the Superior Court of New Jersey, County of Essex, on or about February 28, 2017. (Compl.). Plaintiff alleges that "Policy 3233 and the fashion in which it was applied to Mignone violates his First Amendment rights in New Jersey as

3

established by the New Jersey Courts . . . ." (Id. ¶ 8). By way of relief, Plaintiff seeks a declaration that Paragraph 1 of Board Policy 3233 is "overly broad in i[ts] application to Mignone and unconstitutional on its face, as being violative of the First Amendment of the United States Constitution." (Id. at 3).

On March 22, 2017, Defendant removed this action to this Court on the basis that this Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331. (ECF No. 1, ¶ 5). Thereafter, on April 6, 2017, Defendant filed a motion to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 2). In summary, Defendant argues that "this Court lacks subject-matter jurisdiction because Plaintiff has not fully exhausted its administrative remedies in accordance with the law and the applicable CBA." (Def.'s Mov. Br. at 7).[1] Plaintiff filed an opposing brief on May 1, 2017 (ECF No. 5, "Pl.'s Br."), and Defendant has replied to same (ECF No. 6, "Def.'s Reply Br."). This matter is now ripe for the Court's adjudication.

## I. Legal Standard

"It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief." *Robinson v. Dalton,* 107 F.3d 1018, 1020 (3d Cir. 1997). As the Third Circuit has recognized, "the purpose of this rule is practical." *Anjelino v. The New York Times Co.,* 200 F.3d 78, 87 (3d Cir. 1999). That is, "the purposes of the exhaustion requirement are to promote administrative efficiency, 'respect[] executive autonomy by allowing an agency the opportunity to correct its own errors,' provide

---

[1] Although Defendant argues that this Court lacks subject matter jurisdiction due to Plaintiff's failure to complete the grievance procedure, the Third Circuit has held that "[f]ailure to exhaust . . . 'do[es] not affect the District Court's subject matter jurisdiction.'" *Anjelino v. The New York Times Co.,* 200 F.3d 78, 87 (3d Cir. 1999) (quoting *Hornsby v. United States Postal Service,* 787 F.2d 87, 89 (3d Cir. 1986)). Accordingly, this Court will analyze Defendant's motion under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim rather than pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. *See id.* (holding that "[t]he District Court should have considered the exhaustion and timeliness defenses presented in this case under Rule 12(b)(6), rather than under Rule 12(b)(1))."

courts with the benefit of an agency's expertise, and serve judicial economy by having the administrative agency compile the factual record." *Robinson*, 107 F.3d at 1018 (quoting *Heywood v. Cruzan Motors, Inc.*, 972 F.2d 367, 370 (3d Cir. 1986)).

In this case, Defendant argues that dismissal of Plaintiff's complaint is warranted because Plaintiff has failed to exhaust its administrative remedies. Specifically, Defendant maintains that Plaintiff had a contractual duty, as outlined in the CBA, to arbitrate the present matter and that this matter is, therefore, not properly before this Court. For the reasons discussed below, the Court agrees.

## II.    Discussion

In its moving brief, Defendant argues that "there is no question that the claims set forth in Plaintiff's Complaint belong before an Arbitrator" and encourages this Court to find that "Plaintiff's claims belong where they started – in arbitration." (Def.'s Mov. Br. at 13). Later, in response to the Plaintiff's acknowledgement that this Court has the jurisdiction to decide whether this matter belongs in arbitration, Defendant contends that this is not a substantive arbitrability issue, but rather is a "scope of negotiations question" over which PERC, as opposed to the courts, "has exclusive authority" to define. (Id. at 11). That is, Defendant argues, for the first time in its reply brief, that this Court lacks the jurisdiction to decide whether this case is subject to arbitration in the first instance.

First, a note on "substantive arbitrability." "Substantive arbitrability refers to the question [of] whether a particular dispute is subject to the parties' contractual provisions." *Bell Atlantic-Pennsylvania, Inc. v. Communications Workers of America, AFL-CIO, Local 1300*, 164 F.3d 197, 200 (3d Cir. 1998). Thus, "the question of substantive arbitrability arises when [the court] must determine (1) if the parties have entered into a valid arbitration agreement, or (2) whether a valid

agreement applies to a specific controversy." *Langlais v. Pennmont Ben. Services, Inc.*, 527 Fed. App'x 215, 217 (3d Cir. 2013). "Unless the parties have clearly agreed otherwise, courts determine whether a certain dispute is substantively arbitrable." *Id.*

The Court first addresses Defendant's argument that this Court lacks the authority to determine whether this matter is arbitrable. Having reviewed the cases filed by Defendant for the first time in its reply brief, the Court does note that, in some situations, there may exist a tension between the authority of PERC and of the courts in determining whether an issue is subject to arbitration. In *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.*, relied upon by Defendant, the Supreme Court of New Jersey explained the interplay between the courts and PERC in determining issues of arbitrability as follows:

> Under our existing legislative scheme it may be necessary to go to both PERC and the Superior Court in order to completely resolve a disagreement concerning the arbitrability of a particular dispute. When one party claims that a given dispute is arbitrable under the contract and the other party resists arbitration, the party desiring arbitration should seek an order from the Superior Court compelling arbitration. See N.J.S.A. 2A:24-1 Et seq. Where the trial judge determines that the real controversy is not one of contractual arbitrability, but rather concerns the propriety of the parties negotiating and agreeing on the item in dispute, he should refrain from passing on the merits of that issue.

78 N.J. 144, 154 (1978). Thus, PERC's authority to opine on the arbitrability of matters generally arises where a matter "concerns the propriety of the parties negotiating and agreeing on an item in dispute." *Id.* This is so because "a matter which is not legally negotiable in the first place cannot be arbitrable." *Id.* at 160. According to Defendant, the issue now before the Court

> is, in reality, a scope of negotiations issue based on preemption—that is, whether the [Association's] allegation that the Board violated Mignone's First Amendment rights, by disciplining him pursuant to District policies, preempts negotiations and renders this issue inarbitrable. Whether the [Association's] constitutional claims belong before the Arbitrator is a question for PERC and not this Court.

(Def.'s Reply Br. at 13). In support of its position that this Court lacks the authority to decide whether this matter should be arbitrated, the Board heavily relies upon the case of *Hunterdon Central High Sch. Bd. of Educ. v. Hunterdon Central High Sch. Teacher's Ass'n*, 174 N.J. Super. 468, 472 (N.J. Sup. Ct. App. Div. 1980). However, that case, unlike the present matter, involved a Petition for Scope of Negotiations Determination in which PERC was asked to decide whether a CBA permitted the parties to enter into a particular negotiation. *Id.* at 471. The issue before the New Jersey Appellate Division in *Hunterdon* was not whether PERC, as opposed to the Court, had the exclusive authority to determine whether an issue was arbitrable, but rather "whether in exercising its conceded jurisdiction over a scope question, PERC improperly rested on a constitutional ground." *Id.* at 474-75.

As framed by the Association in its request for arbitration, the issue is whether the Board "violated contract language, administrative code and any other relevant article, statute or board policy when they disciplined Mr. Michael Mignone over an electioneering concern." (Def.'s Mov. Br; Exh. H). The mere fact that Plaintiff raises constitutional issues in its Complaint does not convert the issue into a question of whether the Board somehow negotiated a term of the CBA that it lacked the authority to negotiate.

In short, the Court finds that the question presented to this Court in this motion is whether Plaintiff should be required to follow-through with the arbitration procedure outlined in the CBA prior to litigating the instant matter. In other words, the Court agrees with Plaintiff that Defendant's motion presents a question of "substantive arbitrability."[2] As the Third Circuit has made clear, "[a]bsent a clear expression to the contrary in the parties' contract, substantive

---

[2] Notably, to the extent that Defendant believes that this matter does, in fact, present a scope of negotiations issue, this Opinion and accompanying Order does not preclude Defendant from filing a Petition for the Scope of Negotiation Determination before PERC.

arbitrability determinations are to be made by a court and not an arbitrator." *Bell Atlantic-Pennsylvania, Inc. v. Communications Workers of Am.*, 164 F.3d 197, 202 (3d Cir. 1999). Accordingly, the Court now considers whether this matter is subject to arbitration.

Generally, an agreement to arbitrate a dispute "'is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *E.M. Diagnostics Sys., Inc. v. Local 169, Int'l Brotherhood of Teamsters, Chauffeurs, Warehouseman & Helpers of America*, 812 F.2d 91, 94 (3d Cir.1987) (quoting, in full, *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). Before requiring a party to arbitrate, a court must engage in a two-step analysis: it must determine first whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the scope of said agreement. *See Century Indem. Co. v. Certain Underwriters at Lloyd's, London, Subscribing to Retrocessional Agreement Nos. 950548, 950549, and 950646*, 584 F.3d 513, 523 (3d Cir. 2009); *Salvadori v. Option One Mtg. Corp.*, 420 F. Supp. 2d 349, 356 (D.N.J.2006).

Here, the Parties do not appear to dispute that they have entered into a valid arbitration agreement by way of the CBA's grievance procedure. The Parties do dispute, however, whether Plaintiff's claims fall within the scope of the CBA's arbitration clause. From Defendant's perspective, this matter falls squarely within the arbitration provision. Defendant contends that "the language of the CBA is unequivocal—the parties have agreed to arbitrate grievances based upon the interpretation, application or alleged violation of (1) District policies and (2) the CBA." (Def.'s Reply Br. at 14). Defendant further argues that "the pending Arbitration and the newly filed complaint arise out of exactly the same events." (Def.'s Mov. Br. at 11). That is, "[b]oth Plaintiff's request for Arbitration and Complaint stem from the interpretation, application, and

violation of District policies as applied to Mignone, following his political activity on November 3, 2015 and subsequent reprimand by the Board." (Id. at 12).

In response, Plaintiff argues that "[a]n arbitrator here would only be able to determine whether the Board, under District Policies 3233 and 7510, had grounds to discipline Mignone." (Pl.'s Br. at 9). In other words, Plaintiff contends that only the Court, as opposed to an arbitrator, can determine whether Plaintiff's constitutional rights have been violated. (Id.). Further, Plaintiff argues that if an arbitrator determined that the Board properly disciplined Plaintiff pursuant to the relevant Policies, Plaintiff would nevertheless be entitled to a judicial determination as to whether Mignone's rights were violated. (Id.).

The Court finds that the instant complaint falls squarely within the scope of the CBA's arbitration provisions. Specifically, the CBA provides that the Association or a member of the Association may file a "grievance," which is defined as a "claim . . . based upon[, *inter alia*,] the interpretation, application or alleged violation of . . . District policies . . . ." (CBA at 9). In this matter, although Plaintiff alleges a constitutional violation, that alleged violation is rooted in Plaintiff's disagreement with the Board over its interpretation and application of the District Policies vis-à-vis Plaintiff. Plaintiff is correct, however, in arguing that if the PERC arbitrators find that the Board properly applied the District policies in Mignone's case, then Plaintiff may still have a viable constitutional claim. However, the Court notes that, if the arbitrators were to find that the Board misinterpreted and/or misapplied the District policies in the first instance, then Plaintiff's request for declaratory relief may be moot. As the Third Circuit has explained, "ruling on federal constitutional matters in advance of the necessity of deciding them [is to be avoided]." *Presbytery*, 40 F.3d at 1462 (quoting *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 413 (3d Cir. 1992).

Plaintiff argues that the New Jersey Declaratory Judgment Act provides an avenue for judicial relief. (Pl.'s Br. at 8-10). This argument, however, places the cart before the horse.[3] While "[t]he Declaratory Judgment Act, 28 U.S.C. 2201, 2202, authorizes federal courts to provide declaratory relief," it does not permit a party to file an otherwise premature action. *Jolly v. United States*, 488 F.2d 35, 36 (5th Cir. 1974). Because this Court finds that Plaintiff has not exhausted its administrative remedies, judicial review of Plaintiff's constitutional claim would be premature at this time.

### III.    Conclusion

For the reasons stated herein, the Court grants Defendant's motion to dismiss Plaintiff's complaint for failure to exhaust its administrative remedies. An appropriate Order accompanies this Opinion.

IT IS SO ORDERED.

June 12, 2017

JOSE L. LINARES
CHIEF JUDGE, U.S. DISTRICT COURT

---

[3] Although Plaintiff relies upon the New Jersey Declaratory Judgment Act, the Federal Declaratory Judgment Act applies in Federal Court. *See Bianchi v. Rutgers, the State Univ. of New* Jersey, 2016 WL 430597, at *11 (D.N.J. Feb. 2, 2016).